IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

In re:                    )
                          )
UNITED STATES OF          )
AMERICA,                  )
                          )
        Plaintiff,        )
                          )
vs.                       )    Case No.
                          )    2:20-MJ-00415
LATROI DEVON NEWBINS,     )
                          )
Defendant.                )
                          )
_____    )

BEFORE THE HONORABLE DUSTIN PEAD

June 9, 2020

Initial Appearance/Detention Hearing
Conducted by Zoom Videoconferencing

**Appearances of Counsel:**

For the Plaintiff:        J. Drew Yeates
                          Bryan N. Reeves
                          Michael J. Thorpe
                          Attorneys at Law
                          U.S. Attorney's Office
                          111 S. Main Street
                          Suite 1800
                          Salt Lake City, Utah 84111


For the Defendant:        Darwin L. Overson
                          Attorney at Law
                          Overson Law PLLC
                          136 E. South Temple
                          Suite 1530
                          Salt Lake City, Utah  84111


Court Reporter:

              Laura W. Robinson, RPR, FCRR, CSR, CP
                    351 South West Temple
                    8.430 U.S. Courthouse
                  Salt Lake City, Utah 84101
                      (801)328-4800

1    **Salt Lake City, Utah**                    **June 9, 2020**

2                          **\* \* \* \* \***

3              THE COURT:  Of course you're welcome to be

4    here, I'm glad that you could join us.  Just a couple

00:01:00  5    of reminders.  Even though the hearing is being

6    conducted by Zoom, the rules of the Court still

7    apply.  So please, no recording, no photography.

8    You're welcome to take whatever notes you would like,

9    but please treat this as you would as if you were in

00:01:15  10   court downtown.

11             Mr. Newbins, let me explain first why we're

12   conducting the hearing by video and let me advise you

13   of an important right.  As you're, of course, aware,

14   we're concerned about the pandemic that's going

00:01:29  15   through the United States and we want to reduce the

16   risk of exposure to you and to others.  And for this

17   reason, we have organized this hearing to go forward

18   by Zoom.  But it doesn't have to.  It's ultimately

19   your decision, Mr. Newbins.  You have the right to

00:01:44  20   demand that this hearing be held in person, or you

21   can waive that right and proceed by way of Zoom here

22   today.

23             Mr. Newbins, what's your preference?

24             THE DEFENDANT:  I waive that right and we

00:01:55  25   can resume right now.

1          THE COURT:  Thank you so much, Mr. Newbins.

2     And as I mentioned, and I'll formally state it here

3     for the record, there are a number of people on this

4     call with us.  Those of most critical import are your

00:03:00  5     attorney, Mr. Overson.  There are three AUSAs on the

6     case, Mr. Reeves, Mr. Thorpe, and Mr. Yeates.

7          THE DEFENDANT:  Okay.

8          THE COURT:  Mr. Newbins, of course, you're

9     here because I have signed a complaint that alleges

00:03:12 10     that you have violated federal law.  Before we talk

11     about the substance of the complaint, I would like to

12     advise you of some very important rights you have.

13          First, you have the right to remain silent.

14     Any statement you make regarding the allegations in

00:03:25 15     the complaint can be used against you.  And my advice

16     to you is please don't make any statement until you

17     have had a chance to thoughtfully talk to an

18     attorney.  And that's the second important right, the

19     right to be represented in this proceeding.  And you

00:03:39 20     have retained Mr. Overson, is that correct?

21          THE DEFENDANT:  That's correct.

22          THE COURT:  Of course, he's very welcome to

23     be here.

24          Mr. Newbins, as I mentioned, this is a

00:03:49 25     complaint, sort of the first step in a larger

```
 1    process.  I need to make sure that you have had an

 2    adequate opportunity to review that complaint and

 3    discuss the charges and the allegations with your

 4    attorney Mr. Overson.  Do you believe that you have

 5    had enough time to review it?

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  Thank you.  Mr. Overson, do you

 8    likewise believe you have had enough time to review

 9    this with your client?

10              MR. OVERSON:  I do.

11              THE COURT:  Mr. Newbins, I need to make sure

12    that you understand the nature of the charges, and I

13    also need to make sure that you understand the

14    maximum possible penalty.

15              Mr. Yeates, one of the prosecutors on the

16    case, is going to be describing that maximum possible

17    penalty as well as the minimum mandatory.

18              Mr. Yeates?

19              MR. YEATES:  Your Honor, the maximum penalty

20    pursuant to 844(i) is a term of imprisonment of

21    20 years, a fine of $250,000, and it also carries,

22    Your Honor, a minimum mandatory of 60 months in

23    prison.

24              THE COURT:  Thank you.

25              Mr. Newbins, did you understand that?
```

00:04:03 (line 5)
00:04:11 (line 10)
00:04:22 (line 15)
00:04:33 (line 20)
00:04:47 (line 25)

1          THE DEFENDANT:  Yes, I did.

2          THE COURT:  Thank you.  As I mentioned, this

3     is an appearance on the complaint and it's the first

4     step in a larger process.  Where we go from here

00:04:59  5     depends on whether the Government intends to present

6     the case for an indictment or proposed indictment

7     before a separate group of citizens called the grand

8     jury.  And if they intend to present that, on what

9     date they might try to do so.  If it cannot be

00:05:15 10     presented for an indictment, then we have to address

11     something else.

12          Mr. Yeates, can you address the questions on

13     whether you intend to present it for indictment?

14          MR. YEATES:  Your Honor, it is our sincere

00:05:26 15     hope that we present the case for consideration of

16     the grand jury.  However, pursuant to the Court's

17     General Order, grand juries are currently not meeting

18     to consider possible federal violations and to return

19     true bills.  Accordingly, we will be prepared for a

00:05:43 20     preliminary hearing, should it come to that point.

21     Our obvious preference, though, Your Honor, would be

22     to take that before the grand jury, and we would hope

23     that the Court is making progress in accommodating

24     that.

00:05:56 25          THE COURT:  Thank you, Mr. Yeates.

1          So Mr. Newbins, what this means is I need to

2    set the case for one of two sort of paths.  The first

3    one is it could be an initial appearance on an

4    indictment if an indictment is returned.  There is a

00:06:09   5    practical concern about whether a grand jury can even

6    be convened due to the pandemic.

7          The other path could be a preliminary

8    hearing.  That's what Mr. Yeates referred to.  At

9    that hearing, I would be making a determination on

00:06:23  10    whether there is probable cause to hold you on the

11    charge for further proceedings.

12          Now, the dates for which these must be held

13    depend very much on whether you're in custody.  The

14    rules prescribe a 14-day limit, absent consent from

00:06:40  15    you, or good cause found by me.  Ms. Sparrow, I would

16    like to find a date within 14 days for either a

17    preliminary hearing or an initial appearance on an

18    indictment.  What do we have available from Weber?

19          THE CLERK:  I'm sorry.  We have -- it's a

00:07:19  20    little tricky -- I'm sorry.  Right now --

21          THE COURT:  Go ahead.

22          THE CLERK:  -- the only thing would be on

23    the morning of the 18th.  Is that too soon?

24          THE COURT:  The morning of the 18th.

00:07:33  25          THE CLERK:  Yeah.

1          THE COURT:  Mr. Overson, would that work for

2     you?

3          MR. OVERSON:  Um, I'll make that work.  Yes.

4          THE COURT:  One of the challenges here is if

00:07:43  5     the grand jury meets on the 17th, could it be turned

6     around if an indictment is returned by the 18th.  But

7     my proposal is that we stick with that date and then

8     we adjust if we need to.  Would that be okay if we

9     called you?

00:07:57  10     Mr. Overson, would that be okay with you?

11          MR. OVERSON:  Yes, it would.

12          MR. YEATES:  Yes, it would.

13          THE COURT:  Ms. Sparrow, I'm sorry, what

14     time was that?

00:08:04  15          THE CLERK:  We can do that at 10:00 a.m.

16          THE COURT:  10:00 a.m. on the 18th.

17          THE CLERK:  Yes.  And it will be telephonic.

18          THE COURT:  Telephonic.  Mr. Overson, would

19     you prefer something different?  A preliminary

00:08:17  20     hearing on video.

21          MR. OVERSON:  Um, yes, video, please.  There

22     is video and photographic evidence.

23          THE COURT:  Got it.  So Teri, let's find our

24     next date that we could do it for Zoom.

00:08:31  25          THE CLERK:  Judge, I have to verify with the

1    jail that any time slots that they offered are still

2    available.  Um...

3            THE COURT:  Do we have anything that we

4    could set tentatively for now and then later confirm

00:08:51  5    it?

6            THE CLERK:  We don't because the schedule

7    they gave me only goes through the 19th.  So I don't

8    have availability at all for that.  So, um...

9            THE COURT:  Nothing after the -- I'm sorry,

00:08:59  10    nothing after the 19th then?

11            THE CLERK:  Right.

12            THE COURT:  Mr. Overson here is what I would

13    like to propose.  Could we come in on the 18th at

14    10:00 anyway and then --

00:09:11  15            MR. OVERSON:  If I might interrupt, I

16    apologize.  Let's set it for the telephonic.  That's

17    fine, we'll submit our exhibits ahead of time and I

18    would just ask that the Government do the same.  If

19    we can properly mark them, I think all of the parties

00:09:25  20    can orient themselves so that we know what we're

21    looking at.

22            THE COURT:  Sure.  Let's do this.  Exhibits

23    marked and provided to opposing counsel by -- can I

24    say noon on the 16th?

00:09:35  25            MR. OVERSON:  Yes.

```
         1            THE COURT:  Great.  And then Mr. Overson,
         2    what I will -- what I would like to propose is we
         3    will continue to communicate with Weber and if we can
         4    find a date that for which video could go forward, we
00:09:48 5    might reach out to you all and suggest something
         6    alternatively if that's okay.
         7            THE CLERK:  Judge?
         8            THE COURT:  Yes.
         9            THE CLERK:  Um, I'm sorry.  I just realized
00:09:58 10   that we could do it on the 17th by video at
         11   11:00 a.m.
         12           THE COURT:  The only challenge is that's the
         13   day of the grand jury return.
         14           THE CLERK:  I know.
00:10:10 15           THE COURT:  Mr. Overson, should we plan on
         16   the 17th and by then we'll know whether the grand
         17   jury can even meet.
         18           MR. OVERSON:  Yeah, let's do that.  Let's --
         19           THE COURT:  What about that, if we move it
00:10:20 20   to the 17th.  I think that will be better.
         21           MR. YEATES:  We'll accommodate that, Your
         22   Honor.
         23           THE COURT:  And if we need to, because the
         24   grand jury is meeting, we may reach out to you and
00:10:28 25   ask to go with a hearing at a later date by
```

1    telephone, if that is the best way.  Teri, what time

2    was that on the 17th?

3              THE CLERK:  That would be 11:00 a.m.

4              THE COURT:  11:00 a.m.  Okay I'll ask the

00:11:05    5    parties to share and mark exhibits by 3:00 p.m. on

6    the 15th.  Please provide me those by that date and

7    time, and then we'll be prepared in the event it is a

8    preliminary hearing.

9              Mr. Newbins, the final issue I have to

00:11:24   10    address is custody, whether you should remain in

11    custody pending the resolution of the case.  There is

12    a number of ways to do this.  I'm happy to try to

13    proceed today, if you would like, or the other option

14    is to hold it over for another date for your attorney

00:11:38   15    to collect information or evidence and argument.

16              Mr. Overson, have you had a chance to review

17    the Government's motion for detention?

18              MR. OVERSON:  I have, Your Honor.

19              THE COURT:  What's your preference?  Would

00:11:48   20    you like to proceed today?

21              MR. OVERSON:  I would like to proceed today,

22    Your Honor.

23              THE COURT:  Terrific.

24              Mr. Yeates, have you been able to share any

00:11:56   25    of the exhibits or items you would like to present in

1    support of your request with Mr. Overson?

2          MR. YEATES:  Your Honor, I sent an e-mail

3    that had a couple of photographs.  Also, Mr. Overson

4    has seen the photographs that were attached to the

00:12:11    5    complaint itself as well as to the United States'

6    motion for detention.

7          However, it is the United States' hope today

8    to play a video that was put together last night by

9    law enforcement.  It has several different clips

00:12:26    10   related to the Defendant in this case and I have not

11   had an opportunity to turn that over to Mr. Overson

12   so he has not seen that particular video.

13         I would indicate that the video has snippets

14   from a variety of different sources including

00:12:41    15   individuals at the protest that turned to a riot, and

16   that it shows a variety of different angles of the

17   Defendant's engagement in the arson of the patrol

18   car.

19         THE COURT:  Mr. Overson, what's your

00:12:55    20   preference here?  Do you want to move forward and

21   adjust as you see it or do you want some time to

22   review it?

23         MR. OVERSON:  Um, you indicated that there

24   was technology here through this Zoom system that I

00:13:09    25   could speak with Mr. Newbins.

1          THE COURT:  Sure.  It's called a brake-out

2     room.  I can send you in there for a few minutes if

3     you would like.

4          MR. OVERSON:  Okay, let's do that.

00:13:18  5          THE COURT:  Okay.  How much time would you

6     like?  Is 5 to 10 minutes okay?

7          MR. OVERSON:  Five minutes is probably

8     sufficient.

9          THE COURT:  Okay.  Ms. Sparrow, let's send a

00:13:26  10    brake-out room to Mr. Newbins and Mr. Overson.

11    Mr. Newbins in front of you a screen is going to pop

12    up that says "accept to join this brake-out room".

13    If you or someone else in that room can click it, you

14    and Mr. Overson will be put over there and you will

00:13:38  15    come back automatically in five minutes, okay?

16          THE DEFENDANT:  I would just have to knock

17    on the door to get someone to come in and do it

18    really fast.

19          THE COURT:  I would appreciate that.  Thank

00:13:47  20    you.

21          THE DEFENDANT:  All right.  Thank you.

22    Excuse me.  Real quick.  I need your help real fast.

23    They want to send us to a brake-out room real fast.

24          THE COURT:  Thank you for helping us.  I'm

00:14:04  25    going to send him and his attorney to a separate

1    brake-out room.  We're going to send a notice to the

2    screen right now to join that room.  If you could hit

3    that when it pops up.

4              JAIL STAFF:  Okay.  I got her.  Whoops,

00:14:16    5    where did it go.

6              THE COURT:  Still there?

7              JAIL STAFF:  I was.  I don't know what

8    happened.  Hold on.

9              THE COURT:  Okay.  Mr. Overson, did you see

00:14:35    10   it?

11             MR. OVERSON:  I don't know where the

12   little -- I went over to get the pop up --

13             THE COURT:  Okay.

14             JAIL STAFF:  And it wasn't there no more.

00:14:47    15             THE COURT:  All right.

16             JAIL STAFF:  There we are, now I got it.

17             THE COURT:  Great.  Thank you.  All right it

18   looks like they have joined that room.  Everybody

19   stand by for five minutes and we'll go from there.

00:15:38    20             (Brief pause in proceedings.)

21             THE COURT:  Welcome back, everyone.  The one

22   challenge with the brake-out rooms is that it

23   automatically returns you on mute.  I'm going to see

24   if we can't unmute you, Mr. Newbins, from here.  I

00:20:48    25   don't see the lock.  Sorry, Mr. Newbins.  Would you

14

1    be kind enough to ask someone else if they can help

2    things?  There we go, perfect.  Terrific.

3    Mr. Overson, have you had enough time?

4             MR. OVERSON:  I have, Your Honor.  I

00:21:02  5    attempted to send Ms. Sparrow as well as Mr. Yeates a

6    small single exhibit.  It is a photo of a text

7    message from Mr. Newbins's phone.  Unfortunately, it

8    is in a weird format so Mr. Yeates has not seen that

9    but I'll describe it for the Court.  If anybody has

00:21:26  10   any objections, just let me know.

11            THE COURT:  Okay.  Let me first start with

12   the basis for detention altogether.  Mr. Overson, in

13   the Government's motion they cite 3142(f)(1), crime

14   of violence, and 3142(f)(2), serious risk that the

00:21:46  15   Defendant will flee.

16            Do you have any argument you want to make

17   regarding those, whether a detention hearing is even

18   authorized under the statute?

19            MR. OVERSON:  Well, Your Honor, I mean I can

00:21:59  20   talk to Mr. Newbins's risk of fleeing.  I have never

21   had a problem with that.  I have represented

22   Mr. Newbins in other matters and I have met with him

23   repeatedly on a civil matter that I have represented

24   him on over the years and he has always been prompt,

00:22:16  25   he has always answered my calls, he has always

1    answered messages.  I see in the detention report,

2    the Pretrial Service Report, that, you know, that

3    there were warrants in the past.  There was one

4    warrant while I represented him and that was the

5    result of a scheduling error by the Court itself and

6    we resolved that immediately.  He has, you know, he

7    has lived here a long time.  I really don't think

8    that he is at risk of fleeing.

9         THE COURT:  I appreciate that.  Thank you

10   for sharing it.

11        Um, in terms of the authority to even hold

12   the detention hearing we have to cross the threshold.

13   The Government has argued competing -- well not

14   competing but complimentary arguments.  One is that a

15   detention hearing is warranted because interstate

16   arson is a crime of violence and therefore a

17   detention hearing can be held.

18        The second argument was that serious risk of

19   flight.  Here is what I would like to propose.  In

20   light of your argument here, maybe we set that

21   serious risk of flight authority to hold the

22   detention hearing off to the side and simply address

23   whether the detention hearing is authorized because

24   the alleged offense is a crime of violence.  Do you

25   have reason to dispute that claim?

1          MR. OVERSON:  Well, the government has

2     alleged that Mr. Newbins set fire to a police

3     officer's car after it had been turned over.  And --

4          THE COURT:  Right.

00:23:44  5          MR. OVERSON:  So --

6          THE COURT:  So it is a legal question about

7     whether the charge that he has been faced with is a

8     crime of violence as defined by federal law for which

9     a maximum term of imprisonment is 10 years or more.

00:23:57 10   I'm not sure if you're contesting that it is -- it is

11    or is not or it isn't a crime of violence.

12          MR. OVERSON:  No.  As a matter of law, the

13    arson would be a crime of violence.

14          THE COURT:  Okay.  Thanks.  So with that in

00:24:09 15   mind, I find that the authority to hold the detention

16    hearing is triggered and the Government has the

17    burden of proof and persuasion here.  They have to

18    persuade me to one of two things, Mr. Newbins.  That

19    you either propose a risk of flight by a

00:24:25 20   preponderance of the evidence, or a danger to the

21    community by clear and convincing evidence.

22          THE DEFENDANT:  Not at all.

23          THE COURT:  It's their job to persuade me of

24    that so I'm going to let them start first.

00:24:37 25          Afterwards, I'm going to turn to your

17

1    attorney, and then if there is anything you want to

2    say, I would be happy to hear it, of course.

3              THE DEFENDANT:  All right.  Thank you.

4              THE COURT:  Mr. Yeates, let's start with

00:24:46  5    you.

6              MR. YEATES:  Thank you, Your Honor.  It's

7    important here to start with an understanding that

8    there is an actual presumption of detention in this

9    case because of the charge that is filed.  And let me

00:25:00  10   go through that with Your Honor.

11             Um, also for the sake of clarification, Your

12   Honor, I would indicate that the statutory basis for

13   the detention hearing is really twofold.  One, this

14   qualifies as a crime of violence under 3156(a)(4).

00:25:18  15   But also, Your Honor, it is a crime that falls under

16   the definitions section located in Section

17   2332b(g)(5)(B).  And both of those, Your Honor, are

18   statutes that are referenced in the detention statute

19   located at 3142(f)(1).

00:25:43  20             Now, it's that same statute that I just

21   mentioned, Your Honor, the 2332b subparagraph G,

22   subparagraph 5, subparagraph big B, that causes the

23   presumption of detention to apply in this case.

24             And I want to have a mea culpa, Your Honor,

00:26:05  25   because I failed to mark that box on my motion and I

1    should have.  And so if the Court does have my motion

2    before it, I would indicate that in the section on

3    rebuttable presumption, I should have marked that box

4    and that subsequent to that I should have marked the

00:26:20  5    box related to subsection C, an offense listed under

6    Section 2332b(g)(5) big B.

7         Now, with that understanding, Your Honor,

8    that indeed a presumption of detention does apply, we

9    then ought to turn to the factors.  And I would

00:26:40  10   argue, Your Honor, that the factors in this case

11   strongly suggest that detention is needed both

12   because Mr. Newbins presents an unmanageable danger

13   to the community, and also because he presents an

14   unmanageable risk of nonappearance.

00:26:58  15        And I would like to start with the nature

16   and circumstances of the offense.  As Your Honor is

17   well aware, having read the complaint, Mr. Newbins

18   was involved in a protest that turned into a riot

19   where a Salt Lake police patrol car was overturned

00:27:15  20   and subsequently was burned.  And the flames were

21   large and it was a rather scary situation.

22        That arson involved more individuals than

23   just Mr. Newbins.  The Court should be aware that

24   there is one other defendant that is similarly

00:27:32  25   charged and we anticipate bringing charges against as

1    many as three additional individuals as we are

2    attempting to identify them who were involved in the

3    arson of the patrol car.

4              In order to give the Court a better

00:27:46  5    understanding of both the nature and circumstance of

6    the offense, but also the amount of evidence in this

7    case, I think it would be helpful at this time to

8    play a video.  And it is about a minute 20 seconds,

9    Your Honor, and it is a -- it has various clips

00:28:03  10   involving Mr. Newbins's role in the arson.  And my

11   colleague, Mr. Reeves, has that video available on

12   his I-Pad.  And so I would ask the Court to allow him

13   to present his desktop and to play that video for all

14   that are on the call and at the hearing.

00:28:25  15             THE COURT:  Mr. Overson, I know you haven't

16   had a chance to see this.  Do you object?

17             MR. OVERSON:  That was the purpose of our

18   discussion off the record with Mr. Newbins and

19   myself, and we have determined that we would like to

00:28:36  20   see the video today presented.

21             THE COURT:  Very good.  Mr. Reeves, we have

22   shared the screen with you or you have the ability to

23   share your screen, I should say.  Go ahead.

24             MR. REEVES:  Thank you.  As I play, please

00:28:50  25   confirm that the audio is also --

1          THE COURT:  For the record, I'm seeing

2     Mr. Reeves's screen.  Pulled up the video clip.

3          MR. REEVES:  Is the video clip now

4     presented, Your Honor?

00:29:29 5          THE COURT:  Yes.

6          MR. REEVES:  Okay.  I'll begin.

7          (Whereupon, the video clip was played.)

8          MR. REEVES:  That is the conclusion of the

9     minute and 12 seconds.

00:30:26 10          THE COURT:  Thank you, Mr. Reeves.

11          MR. YEATES:  Your Honor, this is Mr. Yeates.

12     Um, the video played a little bit choppy, but I think

13     the Court can see what we're dealing with here and

14     that is very high level video, very clear to show

00:30:44 15     Mr. Newbins.  Also clearly shows him throwing a

16     banner onto a small fire.

17          THE COURT:  Mr. Reeves, can you mute that?

18     Thank you.  Sorry, Mr. Yeates.  Go ahead.

19          MR. YEATES:  The reason I think that's

00:31:09 20     important, Your Honor, is twofold.  One, under the

21     nature and circumstance of the offense, but also on

22     the weight of the evidence.  From a weight

23     perspective which is discussed in Section 3142(g)(2),

24     the weight is very heavy in this case.  We have video

00:31:27 25     evidence from multiple sources showing Mr. Newbins

21

1       participating in the arson and throwing what acted as

2       kindling onto that fire in order to increase the size

3       of the fire which eventually overtook the patrol car

4       and burned it all the way to the rims.  The tires

00:31:46   5       actually burnt off, Your Honor.

6               Now also looking through the Pretrial

7       Services Report, I think it's important to note for

8       sake of the Defendant's risk of nonappearance that he

9       has significant contact outside of Utah.  In fact, he

00:32:04  10       has moved all over the country during his life.  He

11       has many siblings that live all over the country.

12       And I'll just mention some of those states where he

13       has significant ties.  California, Nevada, Colorado,

14       Texas, New Mexico, Ohio, Washington, and Hawaii.

00:32:24  15               It's unusual for defendants in this district

16       to have those type of contacts outside of the

17       District of Utah.  Looking at those contacts outside

18       of the District of Utah, coupled together with his

19       history of failures to appear, I think that he

00:32:39  20       presents a non-manageable risk of nonappearance.

21               I understand the arguments of counsel

22       related to nonappearance, specifically that there --

23       one of those nonappearance in state court was a

24       mistake.  But it is worth noting, Your Honor, that

00:32:57  25       this Defendant, Mr. Newbins, has actually been

1    convicted of failure to appear and that was related

2    to a Midvale Justice Court case where he was charged

3    with failure to appear and was convicted of failure

4    to appear.

00:33:12  5         Let me turn for a moment, if I might, to

6    Mr. Newbins criminal history.  And I would note, Your

7    Honor, it has gone back approximately 12 years.  For

8    12 years he has had a number of run-ins with the law

9    here in the State of Utah and it has varied.  For

00:33:30 10  instance, he has been charged with and convicted of

11   disorderly conduct, possession of a controlled

12   substance, criminal mischief, driving under the

13   influence, failure to appear, false information to a

14   law enforcement officer, interference with an

00:33:46 15  arresting officer.  And he has also, Your Honor, been

16   charged with a rather, if I might say, heinous

17   domestic violence situation where it is alleged that

18   he used a cloth belt around a female victim to

19   strangle her and where she couldn't breathe and

00:34:06 20  nearly passed out.

21        Looking at this criminal history, Your

22   Honor, I believe there is two things to take from

23   that.  Number one is that he has a long history of it

24   and it has been unceasing.  It has been continual and

00:34:19 25  it has been frequent.  But number two is that through

1    that criminal history he has had myriad failures to

2    comply.  And those failures to comply and failures to

3    appear are indicative of someone who is a flight

4    risk, someone who is not a manageable risk of

00:34:37 5    nonappearance.

6          Your Honor, it also bears mention that I

7    have spoken with the Salt Lake City Police Department

8    who is the victim in this case and they have

9    indicated their recommendation that Mr. Newbins be

00:34:53 10   detained pending trial.  As I look at the criminal

11   history score here, Your Honor, I see a Category 4.

12   And what I would suggest, Your Honor, is that is due

13   in part to the fact that Mr. Newbins is relatively

14   young.  But based on his criminal behavior, he is

00:35:10 15   well on his way to having a Category 5.

16          With that in mind, Your Honor, I would argue

17   and ask the Court to find that Mr. Newbins is both an

18   unmanageable risk of nonappearance, and an

19   unmanageable danger to the community and I would ask

00:35:30 20   the Court to detain him pending trial.

21          THE COURT:  Mr. Yeates, could I ask you a

22   couple of questions, please?

23          MR. YEATES:  Absolutely.

24          THE COURT:  Your complaint cites the

00:35:41 25   discovery of Mr. Newbins from his participation in a

1       peaceful protest downtown on June 1st, right?

2                MR. YEATES:  That's correct.

3                THE COURT:  The complaint also cites an

4       article from the news that says, quote, "Defendant

5       negotiated a peaceful exit for the group without mass

6       arrests."

7                How do you balance the conduct, the alleged

8       conduct, from May 30th with what appears to be a key

9       de-escalating role on June 1st, just a couple of days

10      later?

11               MR. YEATES:  Your Honor, the United States

12      does not prosecute individuals based upon their

13      character but based upon their behavior.  And here,

14      while there may be some behavior that Mr. Newbins has

15      displayed that is praiseworthy, that, Your Honor, is

16      -- pales in comparison, if I might, to the idea that

17      he worked in order to burn a law enforcement vehicle

18      to the ground.

19               As the Court may have seen through the

20      video, albeit choppy, the protestors, turned rioters,

21      moved away from that vehicle for fear it was going to

22      explode.  And certainly that was a possibility here.

23      When we're dealing with gas tanks and vehicles on

24      fire, explosions absolutely are possible.  And so he

25      put himself in danger, he put other protestors and

1    rioters in danger.  He also put other first

2    responders in danger.

3         I might also mention, Your Honor, something

4    that perhaps Mr. Overson will bring up as well, that

00:37:21 5    there is video that shows Mr. Newbins prior to

6    putting kindling on the fire, putting out another

7    small fire in the patrol car.  And so there was --

8    there were small flames and there is video showing

9    Mr. Newbins pouring perhaps two or three bottles of

00:37:42 10   water to put that fire out.

11        And so what we do have is some

12   inconsistencies.  Why one moment would Mr. Newbins

13   try to put the fire out using water, and then moments

14   later attempt to increase the heat and the flame by

00:38:00 15   putting kindling on it.  And it's difficult to answer

16   this, but perhaps, Your Honor, Mr. Newbins was

17   overtaken by the emotion that was overtaking many

18   individuals at the protest that turned this protest

19   into a riot.

00:38:17 20        And so I do not contest that Mr. Newbins has

21   done good things in his life.  Nor do I contest that

22   he peacefully resolved a later protest.  But what I

23   would argue, Your Honor, is that with a criminal

24   history that dates back 12 years with consistent and

00:38:36 25   involves acts of violence, including running from

1    police on foot, this is an individual that simply

2    isn't a good choice for release in this particular

3    case.

4          THE COURT:  Referring back to June 1st, and

00:38:55  5    I don't mean to suggest that I want to step outside

6    of my role, I certainly don't, it is your

7    responsibility and weighty obligation to determine

8    how and when to charge individuals.  The only

9    question I had was about dangerousness.  If the

00:39:11  10    belief is that Mr. Newbins was dangerous on May 30th,

11    it seems like presented with similar circumstances he

12    chose a different path on June 1st.  Though I

13    wondered if the conduct on June 1st suggests that

14    perhaps he is not as dangerous as you might argue and

00:39:27  15    that he may have been, as you said, caught up more in

16    the bad moment of June 30th and instead embraced the

17    good moment on June 1st.

18          Is there anything else that you want to add

19    on that contrast?

00:41:04  20          MR. YEATES:  Going back to the criminal

21    history, we see a history of violence, Your Honor.

22    We see criminal mischief which is, of course, the

23    damage of property.  We see the interference with a

24    law enforcement officer where the defendant, a

00:41:22  25    passenger in a motor vehicle, fled on foot and then

1   once apprehended gave false personal identifying

2   information.  And then we see the domestic violence

3   charge that was eventually dismissed because the

4   victim was unaccessible or inaccessible.  But the

00:41:40  5   facts that were alleged in the charging document are

6   grave indeed.

7           When we look at those facts and then we see

8   the video that clearly shows Mr. Newbins throwing

9   kindling onto the fire, this is an individual with a

00:41:57  10  history of violence and that cannot be made up for by

11  one good act at a protest the day after the arson.

12          THE COURT:  Maybe you have already addressed

13  this point but I didn't see anything that suggests

14  that he started it.  He, I guess, literally added

00:42:12  15  fuel to the fire if I understand your allegations,

16  but he didn't -- he wasn't the one that started it.

17  Am I wrong there?

18          MR. YEATES:  You are correct.

19          THE COURT:  Okay.  Let me ask you about his

00:42:23  20  residence in Utah.  As you correct -- I think you

21  correctly state, the Pretrial Service Report reflects

22  connections in many places.  My understanding of the

23  report though is that he has been in Utah for the

24  past year or so at least.  That's with his common law

00:42:42  25  wife.  I believe she is the one that maybe the

28

1    purported victim from the 2017 matter.  He also has a

2    sister that resides here.  It seems to me that he

3    didn't come in from out-of-state.  Is that a fair

4    reading of the report from your point of view?  Has

00:42:57  5    he been residing here for a while as far as you can

6    tell?

7         MR. YEATES:  Yes.  Looking at his criminal

8    history, rap sheet as we often call it, it does

9    appear that Mr. Newbins has lived in Utah for quite

00:43:10  10    some time and that his criminal history tends to

11    indicate that he has been here in Utah at least since

12    age 18.

13         THE COURT:  So the risk of flight is

14    probably more, if I understand your argument, about

00:43:22  15    his failures to appear or comply than it is that he

16    would flee the district.  Have I put words in your

17    mouth?

18         MR. YEATES:  You have not put words in my

19    mouth but I have not adequately argued our position.

00:43:35  20    And that is, Your Honor, that Mr. Newbins now faced

21    with a five-year minimum mandatory that is punishable

22    by up to 20 years in prison, has a significant reason

23    and incentive to flee.  And the reason I think it is

24    important to look at his many connections outside of

00:43:53  25    the District of Utah is that those are areas where he

1        could seek refuge should he seek to flee.

2                And I would also argue, Your Honor, that

3        based on his failures to appear in state court and in

4        misdemeanor proceedings, those are with relatively

00:44:12  5        low stakes.  But this is a very high stakes case

6        where if convicted, the district court judge will be

7        required to impose no less than 60 months in prison.

8        That is a significant incentive.  And so his

9        connections outside of the District of Utah should be

00:44:29 10        of concern to the Court, they're certainly of concern

11        to the United States.

12                THE COURT:  Thank you, Mr. Yeates.

13                Mr. Overson, I want to turn to you and

14        Mr. Newbins now.  But before I do this, um, I have

00:44:40 15        been following Mr. Yeates citations of the statutes

16        regarding the rebuttable presumption.  As I have

17        looked at it, as he described it, I believe that he

18        is correct that there is a presumption that

19        Mr. Newbins should be detained.  That triggers a

00:44:57 20        burden of production, but it does trigger something.

21        I know that you may be at a little bit of a

22        disadvantage because the motion didn't cite that they

23        believed that there was a presumption of detention

24        but frankly as I followed him walking through it, I

00:45:12 25        think it is triggered.  Do you -- were you able to

1    follow that with us?

2            MR. OVERSON:  Yes, Your Honor, I think it is

3    also triggered.  I think he is correct.

4            THE COURT:  Okay.

00:45:21    5            MR. OVERSON:  Um, and in terms of the burden

6    of production, I am -- I have, as I mentioned, a

7    photo of text messages that I can describe for the

8    Court, if there is not an objection from the

9    Government, or, you know, I would otherwise have to

00:45:44   10    convert the format.

11            THE COURT:  Is it on your desktop, the same

12    location where you're appearing by Zoom?

13            MR. OVERSON:  Yes.  Yes.

14            THE COURT:  This -- you had indicated that

00:45:54   15    this was your first time on Zoom, right?

16            MR. OVERSON:  It is.

17            THE COURT:  We have something called share

18    screen.  Do you see at the bottom of the Zoom

19    software in front of you, on the screen in front of

00:46:06   20    you on Zoom it says "share screen".

21            MR. OVERSON:  Yes.

22            THE COURT:  If you hit that, it should give

23    you all of the screens that are open and allow you to

24    pop-up the screen that you're referring to.  It is --

00:46:18   25    is the text message in a photo or something on your

1    desktop right now?

2           MR. OVERSON:  Yes.  I have taken a picture

3    of Mr. --

4           THE COURT:  Is it open and available on one

00:46:26  5    of your screens?

6           MR. OVERSON:  It is.

7           THE COURT:  If you don't mind, why don't we

8    ask you to hit "share screen", it will pop-up all

9    your windows and maybe we can do it that way.  Why

00:46:38  10   don't we give it a shot.

11          MR. OVERSON:  Okay.

12          THE COURT:  We're putting you on the

13   technological hot seat here.

14          MR. OVERSON:  Bear with me.  I tend to run a

00:46:53  15   lot of windows open, sir.

16          THE COURT:  Yeah.  That can be a challenge.

17   So you just have to find it.  But it did open all of

18   the windows, right?

19          MR. OVERSON:  Yes, but I don't see that one.

00:47:07  20          THE COURT:  If your -- the photo you want to

21   show us has to be open and in some application.

22          MR. OVERSON:  It is.  It actually is, Your

23   Honor.

24          THE COURT:  Okay.

00:47:19  25          MR. OVERSON:  There is -- under the advanced

32

1    settings there is an option for, it looks like,

2    sharing a portion of screen.

3             THE COURT:  Okay.

4             MR. OVERSON:  I'm going to try that and see

00:47:32  5    if that works.

6             THE COURT:  Let's try this one more minute

7    and then if it doesn't work, I'll just have you

8    describe it.

9             MR. OVERSON:  Okay, that's not working.

00:47:41  10   Okay.  Okay, there is some settings here that --

11   okay.  There we go.

12            THE COURT:  Great.  Perfect.

13            MR. OVERSON:  Okay.

14            THE COURT:  Great.

00:48:24  15            MR. OVERSON:  Do you see that?

16            THE COURT:  Describe that.  Sure.

17            MR. OVERSON:  Yeah.  So this is a text

18   message link or a chain between Mr. Newbins.  This is

19   a photo I have taken with my phone of Mr. Newbins's

00:48:38  20   phone.  The conversation, as you can see, is DJ

21   Shaquille his brother.  So this is effectively his

22   common law wife's brother, so essentially his

23   brother-in-law.  And the text message takes place

24   after the situation with the police car downtown.  As

00:48:59  25   is fairly obvious because the brother-in-law has sent

1    him a copy of the -- the YouTube from one of the

2    channel -- one of the news channels as indicated

3    early on in the photo.

4          And then the brother-in-law says, "You put

00:49:17 5    the fire out my menja" and he says, "Yeah, I had a

6    roll of wet paper that I threw into the fire, but it

7    was too late.  It was already burning hell up." So

8    this is before -- this is before, you know, he knew

9    he was under investigation and, you know, he's just

00:49:40 10    describing this to his brother-in-law saying yeah,

11    it's unfortunate I couldn't put it out.  And that I

12    spoke to other witnesses -- how do I get back?

13          THE COURT:  You would hit "end share screen"

14    at the top, it might show something, right at the top

00:49:55 15    of your desktop.  There you go.  Thank you,

16    Mr. Overson.

17          MR. OVERSON:  Okay.  And I appreciate

18    everybody being patient with me on this.

19          THE COURT:  No problem.

00:50:03 20          MR. OVERSON:  Okay.  So I spoke with other

21    witnesses who have indicated they saw Mr. Newbins put

22    out the first fire and attempt to put out the second

23    fire.  He didn't start the fire.  They had several

24    bottles of water and they wetted -- he wetted down

00:50:28 25    this roll of paper and was trying to smother the fire

1    out but it was simply too hot.  And I understand why

2    the Government thinks what they think, but as the

3    Court has pointed out, Mr. Newbins's behavior after

4    the fire, at subsequent peaceful protests, was

5    commendable, just, you know, de-escalating a

6    situation that frankly could have been quite

7    dangerous for citizens and police officers on June

8    1st, being an individual seeking peace.  And I

9    haven't had an opportunity to really delve deep in

10   his phone and I'm in the process -- I'll be turning

11   the phone over to the Government, probably later

12   today, it depends on when they get the warrant, but I

13   have perused a couple of the other text message

14   chains and in it I see Mr. Newbins communicating with

15   other people who were there to demonstrate as they're

16   on their way or -- and his message to them is let's

17   keep this civil, you know, we don't want a bunch of

18   shenanigans, we don't want to damage because that

19   takes away from the message.  So that's the

20   individual we're dealing with.

21            In terms of his risk of flight --

22            THE COURT:  Could I interrupt you there?

23            MR. OVERSON:  Yes.

24            THE COURT:  Obviously this is the first that

25   I have heard that the proffer is that it was a bunch

1    of wet like wrapped up wet paper towels or banner or

2    something.

3         MR. OVERSON:  Right.

4         THE COURT:  Do you have any proffer that you

00:52:14 5    can give me on where he got it, how it was wet, how

6    he drenched it, any of that sort of stuff?

7         MR. OVERSON:  Well, I don't know where he

8    pulled the paper from, but in the vehicle, in his

9    vehicle, they had brought water because it was a hot

00:52:30 10    day.  And that's the water that he used to douse the

11    paper in an effort to make it a dampening.  So

12    whether --

13         THE COURT:  How close was his car to where

14    the arson took place?

00:52:43 15         MR. OVERSON:  That I don't know.

16         THE DEFENDANT:  I was in the middle of the

17    intersection.

18         THE COURT:  So by Mr. Newbins?

19         THE DEFENDANT:  Yes, I was right in the

00:52:53 20    middle of the intersection where I could plainly see

21    everything.  In between both of the -- the tracks,

22    right in the middle of the road.

23         THE COURT:  Got it.  Thank you.  So the

24    proffer is, if I understand it, Mr. Overson, that it

00:53:08 25    was water -- or a water soaked banner or something

1    with the intent to put a fire out consistent with an

2    earlier statement I think conceded by the government

3    that he had tried to put the fire out with water

4    bottles.  Whether it was fruitless or not, I guess,

00:53:25  5    is apart from the issue of whether he was trying to

6    add kindling or taking away the strength of the fire.

7    Is that your proffer?

8         MR. OVERSON:  It is, Your Honor.  He was

9    successful in putting out the first fire.  The only

00:53:36  10    reason he wasn't successful this time is that the

11    fire had grown to such an extent that it was simply

12    too hot for him to be close enough to douse it.

13         THE COURT:  One of the challenges that I

14    face in a detention hearing is determining the weight

00:53:50  15    of the evidence.  Obviously, I have seen the picture,

16    I've seen the audio -- or the video now but I

17    probably would need to go back and look at that and

18    see if there is any indicia of whether it was dry or

19    wet.  Did you see anything in the video?

00:54:02  20         MR. OVERSON:  You know, I don't think you

21    can tell by watching the video.

22         THE DEFENDANT:  You can't.  You can't.

23         THE COURT:  Are there witnesses and things

24    that you would present in support of the claim that

00:54:10  25    it was wet and it was doused?

1          MR. OVERSON:  Yes.  We have several

2     witnesses that have told me through a third-party, I

3     haven't interviewed them yet, so --

4          THE COURT:  So that's where we are angling

00:54:24  5     on the preliminary hearing then?

6          MR. OVERSON:  Yes.

7          THE COURT:  I see.  Go on.  I'm sorry, I

8     interrupted you about the risk of flight.

9          MR. OVERSON:  You are free to interrupt me

00:54:33 10     any time, Your Honor.

11          On the risk of flight, as I said I have

12     represented Mr. Newbins for an extended period of

13     time.  I'm sitting here looking at the dockets from

14     the state court matters.  You know, the Government

00:54:48 15     referred to this assault and that the Government

16     wasn't able to go forward and it got dismissed.  I --

17     I don't know what bearing this particular example

18     would have.  The case was dismissed, it was dismissed

19     without prejudice, so the government had -- the state

00:55:04 20     had an opportunity to put its case together and

21     proceed.  It chose not to.  Um, the case was closed

22     in July of 2017 and the docket indicates that the

23     victim was present and left.  So I --

24          THE COURT:  What do you mean was present and

00:55:22 25     left.  Unable to locate victim witness is what it

1    says.

2              MR. OVERSON:  I'm looking at the docket from

3    7/3 maybe we're -- I'm looking at a case number

4    ending 1904.

00:55:36  5              THE COURT:  Right.  I'm looking at the

6    Pretrial Services Report and maybe you're looking at

7    the docket.

8              MR. OVERSON:  I'm looking at the docket and

9    I'll quote, "State not ready to proceed, comma,

00:55:46 10   victim left, period.  State's motion for dismissal of

11   case Court grants without prejudice."

12             THE COURT:  So it could be this.  It could

13   be that they're saying the same things.  The Pretrial

14   Services Report says unable to locate victim or

00:56:00 15   witness.  I think the premise here is witness

16   unavailability, right?

17             MR. OVERSON:  Right.  But I do think it

18   speaks something to the weakness of that case to

19   begin with that the victim actually showed up,

00:56:14 20   interacted with the prosecutor, and left.

21             THE COURT:  Okay.  I see what you're saying.

22             MR. OVERSON:  Um, I look at the rest of his

23   criminal history and we're looking about -- we're

24   talking about, you know, fairly low level stuff.  The

00:56:33 25   only other felony charge and I don't have that screen

1    up right now, I believe it was a possession of

2    marijuana, um, and then the rest of it is, you know,

3    a DUI, driving without an interlock, no insurance,

4    pretty low level justice court stuff.

00:57:02   5    Um, we did have him on another case that was

6    a felony and it got dismissed outright for, you know,

7    evidentiary reasons.  And the others were involved

8    and Mr. Newbins wasn't involved in the criminality

9    aspects of that.

00:57:17   10    So, um, I really don't think that he is a

11    flight risk.  And even -- even if there is some risk,

12    and there is always some risk, even if he is a level

13    one there is a risk of failure to appear.  Pretrial

14    monitors people all of the time by ankle monitor.

00:57:38   15    And, you know, he is not a man of great means.  He is

16    not going to go buy a ticket to Mexico and hide out

17    to avoid these charges.  He has got reasons to be in

18    this -- in this city.  He has got children at home.

19    His wife called me on a regular basis.  I could hear

00:57:56   20    them screaming in the background.  She is about to

21    pull her hair out trying to take care of young

22    children.  Um, and frankly, 30, he is old enough --

23    THE COURT:  I saw that.

24    MR. OVERSON:  You know and he is the primary

00:58:13   25    caregiver at least to one of them and I base that on

1    my own observations of him and his family.  He is the

2    one that is able to control the one child that is

3    kind of hyperactive, frankly.

4         THE DEFENDANT:  The two year old.

00:58:28  5         THE COURT:  When you say primary caregiver,

6    one of the concerns I have about the Pretrial Service

7    Report is this unanswered void between claims of

8    disability from 2016.

9         MR. OVERSON:  Right.

00:58:38  10         THE COURT:  And an absence of any disability

11    finding and no -- not working.

12         MR. OVERSON:  Right.

13         THE COURT:  That concerns me.  It also

14    concerns me about whether he should return to this

00:58:47  15    home in light of the allegations from 2017.  I'm also

16    a little concerned about mental health condition and

17    drug use, right.

18         MR. OVERSON:  Yes.  And you know what, all

19    of those are valid concerns, Your Honor, and I would

00:59:03  20    like to address them.

21         THE COURT:  Okay.

22         MR. OVERSON:  So first of all the

23    disability.  He is -- he just started the process.

24    He is not very far in the process for applying for

00:59:13  25    disability.  And he had an appointment with Valley

1    Mental Health to address the mental health issues.

2              THE COURT:  When was that?

3              MR. OVERSON:  What's that?

4              THE COURT:  When is that?

00:59:25  5    MR. OVERSON:  Um, I don't recall the date

6    but the arrest interfered with the appointment

7    itself.

8              THE COURT:  It was set before June -- before

9    May 30th?

00:59:35  10             MR. OVERSON:  Yes.

11             THE COURT:  Okay.

12             MR. OVERSON:  And, Your Honor, the concern,

13   and I think that the mental health issue is -- stems

14   from his physical health issues.  I represent him on

00:59:46  15   a personal injury claim.  He was in a pretty severe

16   car accident and has pretty substantial injury to

17   most of his spinal column.  And since that accident,

18   he has been involved in multiple accidents and it has

19   aggravated the condition along the way.

01:00:05  20             So I don't know.  My experience with back

21   injuries, Your Honor, when they're chronic like this,

22   is they go hand-in-hand with mental health issues.

23             THE COURT:  How does disability -- I guess

24   it is not obvious to me what the -- you mentioned it

01:02:57  25   is a spinal issue.  I have only seem him from

1    appearing here in court and then also from the video,

2    and I don't mean to suggest that I'm any expert, but

3    what is the disability that prevents employment then?

4            MR. OVERSON:  It is -- well it is twofold.

01:03:13  5    The mental health aspects of it but I think that is

6    the lesser aspect of it.

7            THE DEFENDANT:  Can I say something, Your

8    Honor?

9            THE COURT:  Sure.  Do you mind if we just

01:03:22  10   wait until I hear from Mr. Overson?  Thanks,

11   Mr. Newbins.

12           MR. OVERSON:  So the spinal issue, Your

13   Honor.  He has got multiple bulged disks.  Um,

14   independent medical examiner has looked at him and

01:03:37  15   found that the injuries are there, um, and that's

16   both cervical throughout his -- throughout his back.

17           THE COURT:  The accident -- the accident --

18   maybe there were many accidents, but what was -- when

19   was the last accident that gave rise or the serious

01:03:54  20   accident that gave rise to the physical disability.

21           MR. OVERSON:  Latroi, help me on the date.

22           THE DEFENDANT:  The last accident I can

23   remember was last year, September, had to be in

24   September like.  September?  No.  I don't want to get

01:04:11  25   it wrong.

1          THE COURT:  But it was last year you say.

2          MR. OVERSON:  The last accident.

3          THE COURT:  Now my concern is that you

4     haven't been employed since 2016 so --

01:04:20  5          THE DEFENDANT:  Correct.

6          THE COURT:  So when -- I don't mean to put

7     you on the spot, but just generally when do you

8     believe that you became sufficiently disabled that

9     you couldn't work?

01:04:29  10          THE DEFENDANT:  After the second accident.

11    I can't recall the date, but when I lost my job after

12    the first initial accident on August 6th of 2016, my

13    job said I couldn't return unless I was able to fully

14    do my job.  And due to the fact that my back was

01:04:47  15    messed up, I couldn't lift more than 50 pounds, I

16    couldn't stand no longer than an hour to two hours,

17    and I couldn't sit no longer than 30 minutes.  So

18    because I couldn't -- because I couldn't do nothing,

19    they did not want me to work no more.  I couldn't

01:05:02  20    even keep my job.

21          THE COURT:  And I don't, again, I don't mean

22    to ask any --

23          THE DEFENDANT:  That is all right.

24          THE COURT:  Why did you not pursue any

01:05:09  25    disability claims then?

1          THE DEFENDANT:  At that time I was -- I was

2     going through the -- I was going through the claim

3     with Darwin trying to get the settlement together.

4     And I was -- I did try to -- I did try to get another

01:05:21  5     job, I did actually, it was at Bimbo Bakeries.  But

6     the job required me to stand on my feet for more than

7     14 hours.  And I -- and you can look it up as well.

8     I worked there for almost like a month and then I had

9     -- I couldn't work no more after that because I

01:05:37 10     couldn't be on my feet no more.

11          THE COURT:  Do you believe that there are

12     places where you could work right now?

13          THE DEFENDANT:  Um, yes, call centers.  My

14     dad has talked about me going back to school.

01:05:48 15          THE COURT:  So again, I hope you don't mind

16     me asking the questions, but if you could work at

17     other places why haven't you?

18          THE DEFENDANT:  To be honest, too, I have

19     been with the kids.  I have three boys at home with

01:06:01 20     my wife.  I'm always there with them.  I'm -- I'm a

21     father first and then due to the injuries and stuff I

22     didn't really think I should have work.  And my wife

23     never really argued with me about it and I always,

24     like I said, I'm always home.  I'm always with my

01:06:20 25     kids.

1        THE COURT:  Is your wife working or was your

2   wife working?

3        THE DEFENDANT:  No, she is on disability as

4   well.  She receives disability as well.  So she

01:06:28  5   doesn't work neither and --

6        THE COURT:  Okay.

7        THE DEFENDANT:  -- I'm home with them all of

8   the time.

9        THE COURT:  Got it.  Thanks for clarifying

01:06:34 10   that.  Sorry, Mr. Overson, I interrupted you again.

11   Go ahead.

12        MR. OVERSON:  No, you're fine, Your Honor.

13   Um, and I just want to point out that the accident

14   that caused the vast majority, or the original

01:06:48 15   injury, if you would, what stems from August of 2016,

16   so it's a fairly longstanding situation.  And, you

17   know, his condition varies.  I think like with any

18   back injury, you know, you are out there doing -- you

19   think you're doing well, you're working in the garden

01:07:06 20   and then you're unable to really do too much for the

21   next two weeks.

22        THE COURT:  Some of the concerns here,

23   Mr. Overson, are, you know, I have seen a few of

24   these reports in my time, it looks like he is

01:07:17 25   self-medicating here too with marijuana.  He hasn't

1  obtained a medical marijuana use card.  I'm a little

2  concerned, for instance, the false information, the

3  flight from law enforcement, the continued to drive

4  on suspended license.  As you say not overly

01:07:32  5  consequential by themselves, but it gives rise to an

6  inference that he is unwilling to keep the rules.  He

7  struggles to comply especially from history from

8  longer ago, how can I be convinced that he would

9  comply with conditions now?

01:07:47  10       THE DEFENDANT:  Your Honor --

11       MR. OVERSON:  Well, I think if you put in

12  place through pretrial random UAs, Mr. Newbins would

13  comply with that.  He has not had access to medical

14  insurance during the vast majority of the last four

02:09:12  15  years and -- and he has -- I mean he will tell you

16  honestly that, you know, he has used marijuana to

17  medicate.  A lot of people do.  Unfortunately that is

18  the situation.  I think he would qualify for a

19  medical card, but he doesn't have that.  And so

02:09:30  20  you're right, um, you know, he has been engaging in

21  illegal activity in that sense.  But we're not

22  talking about holding him in detention because he has

23  smoked marijuana.  We're -- the Government is asking

24  you to hold him in detention because he committed

02:09:47  25  arson and there is good reason to believe that

1  Mr. Newbins was trying to prevent an arson, prevent

2  damage to property.  So I --

3          THE COURT:  I think that that is the

4  evidence that you are going to be collecting for the

02:10:01  5  preliminary hearing that it wasn't a contribution to

6  the fire but rather it was an attempt, whether no

7  faith, you know, whether successful or not it was an

8  attempt to put it out not add to it, I think.  That's

9  the million dollar question in your mind.

02:10:16  10          MR. OVERSON:  Yes.  And in terms of, you

11  know, his compliance, um, you know, I think if he is

12  on pretrial he is going to -- he is going to follow

13  the rules.  My other --

14          THE COURT:  He does have that failure to

02:10:30  15  appear.  I mean he has a conviction, it is a

16  citation.  I think what is that, a Class C maybe.

17          MR. OVERSON:  $50.  It is a $50 fine out of

18  the Midvale Justice Court.

19          THE COURT:  No, I understand that the

02:10:41  20  seriousness of it doesn't, you know, doesn't warrant

21  any drastic action, but when you see things like

22  driving on suspended license, failure to obey,

23  failure to appear, those all contribute to a belief

24  that he struggles to comply with conditions.

02:10:56  25          MR. OVERSON:  Right.

1        THE COURT:  And then when he -- when he

2   flees on foot and then gives false information when

3   officers approach him, do you think those are fair

4   considerations on whether he would keep conditions

02:11:08  5   now?

6        MR. OVERSON:  I think they are.  Um, but

7   most of those experiences are quite dated.  Um, as I

8   have said, my experience with him is that he is

9   prompt, um, he is on top of things, he answers the

02:11:19 10   calls, he responds to messages, and he shows up in

11   court when I tell him he has got court.

12        In fact, in fact, he usually is the one

13   calling me confirming whether or not we have a court

14   date.  So that's my recent experience with him.  And

02:11:33 15   as I said, I have been representing him now for, you

16   know, somewhere around three years.

17        THE COURT:  Thanks, Mr. Overson.

18        Mr. Newbins, you have been really patient as

19   we have -- as I have talked to the attorneys.  I just

02:11:46 20   want to remind you, you don't have to say anything

21   today.  If you would like to, I am happy to hear from

22   you, I'm here to listen.  So go ahead.

23        THE DEFENDANT:  Thank you.  I definitely

24   want to speak for myself as well, too.  Darwin has

02:12:11 25   always been there on my side every time I have been

1    in some legal issues.  I have always complied.  I

2    have never went back on my word.  One thing that I

3    live by that I always followed from a long time

4    teaching from my father, you're a man of your word.

02:12:26  5    You can't keep your word, then what do we have.

6         And over the past history, yes, I have I had

7    some violence.  I had some things that weren't right.

8    But as -- I am 28 years old.  I got four -- I got

9    four siblings that look up to me, all boys, three

02:12:43  10    that stay home with me.  I am with them all the time.

11    They know who I am, they see me, and I am a family

12    orientated.  Yes, I have done some wrong, but I'm

13    making up for everything that I have done.  And as I

14    am getting older, I'm not trying to do nothing else

02:13:02  15    but do the right thing.  Yes, like I said, I've done

16    some bad things in my past.  I can't go back and

17    change nothing I done.  But right now, what I'm

18    doing, I'm doing what I'm supposed to be doing.  I've

19    been staying out of trouble.  Yes, I had violations

02:13:19  20    driving because I still need -- I need to still get

21    around and take care of my family.  So yes, I have

22    violated that.  Yes, I confess to that.  But I have

23    -- I have good cause.  If anybody was in my situation

24    what would they have done?  I still got to get

02:13:36  25    around.  I try to make ways to make room to do things

1    that I'm supposed to do.  And yes, I still -- I still

2    slip and fall every day.  But I'm always trying to

3    stay up on my seat.  I'm not trying to sit here and

4    do stuff that ain't supposed to be right, I don't

02:13:50  5    want to sit here.  Um, sorry, I'm -- I'm so nervous

6    because this is my first time ever facing a federal

7    charge in my life.  And it's -- it's bothering me.

8    I'm sorry.

9         THE COURT:  Take your time, it's fine.

02:14:07 10    There is no rush, I want to hear from you.

11         THE DEFENDANT:  Okay.  I'm not trying to

12    cause no damage.  I'm not trying to be a menace to

13    society.  I done that when I was younger.  I'm a

14    model citizen.  I'm sorry.

02:14:35 15         THE COURT:  That's okay.

16         THE DEFENDANT:  All -- all I'm trying to do

17    is raise my kids the right way.  I got four that look

18    up to me.  I'm their hero.  The last thing I want

19    them to see me do is anything wrong.

02:15:07 20         I got a wife that respects everything I do.

21    She has always been in my corner.  She has always

22    told me if you don't listen to me something bad is

23    going to happen.  She even told me not to go.  But I

24    woke up that morning and I felt like I had to go.  It

02:15:25 25    was for a cause, it was -- and it was for justice.  I

1    wasn't going down there to cause no damage.  And I --

2    and if I had a bullhorn that Saturday, I would have

3    been protesting them to not do anything.  But it was

4    circumstances that happened down there.  I wish -- I

02:15:43  5    wish they was showing videos of me when I was trying

6    to put the fire out versus when I'm running up to the

7    car trying to throw something into it.  And that's

8    not my character.

9              THE COURT:  How soon after the fire was lit

02:15:57  10   did you show up with water bottles?

11             THE DEFENDANT:  The first one or the second

12   fire?

13             THE COURT:  I guess the first one.  So the

14   first with one went out?

02:16:05  15             THE DEFENDANT:  Yes.  We had -- I had

16   protestors on the side behind the barricades throwing

17   water bottles to us so we could put it out.  I even

18   yelled at the people that threw fireworks or whatever

19   else they was throwing in the car to not do that when

02:16:19  20   they were tearing it and vandalizing that.  But they

21   don't got none of that on video at all.  They just

22   got that one clip on the news when she finally showed

23   up, she didn't see nothing that we did until that

24   fire was getting started.  And that's -- that's all

02:16:33  25   we're going based on right now is what I did when I

1    ran up to the car was I making it worse or was I

2    trying to prevent it.  I tried to prevent it the

3    first time.  Then I seen them doing it again and I

4    ran to my own car and grabbed that out and had a

02:16:48  5    little bit of water and wet it all on that paper to

6    try to smother it out.  But by the time I got to the

7    car, those flames are already too big and I already

8    knew my attempt to try to put it out the second time

9    was not going to work.

02:17:13  10         So I left.  And I stayed right there and

11   watched it.  I even had my two year old son with me,

12   and my best friend with me, and she asked me did you

13   put it out?  I said no, it's hell-a-burning and we

14   left.  That's when I watched everybody started

02:17:30  15   leaving from the library and they started marching up

16   to the capitol.  So I didn't even stay down there

17   after the fire in the police car got started and I

18   left and I followed everybody.  I was wondering where

19   everybody was going and they was marching to the

02:17:45  20   capitol.  So that is what I'm saying, I wasn't down

21   there trying to vandalize anything.  That was not the

22   purpose of me going down there that day.

23         And the part that I can't stress about, I

24   woke up that morning, like I said, and something

02:17:59  25   called me to go down there.  And I -- I'm a true

1    believer in God and I felt like I was supposed to be

2    down there.  So I went, against my wife's judgment,

3    against my family's judgment, I said no, I said I'm

4    going to go down there and protest as well.  And

02:18:14  5    that's what I did.  But I wasn't down there trying to

6    be incriminating myself or anything.

7            For God's sake, if I was going to do any of

8    that I would have worn a mask like the rest of them.

9    I would have had my face covered up too if I wanted

02:18:27 10    to vandalize and destroy property.  I was down there

11    bold face.  My face was all over the scene.  A lot of

12    people were down there with me.

13            THE COURT:  Yes.

14            MR. OVERSON:  Your Honor, I just would like

02:18:39 15    to add a piece here, just for clarification, and then

16    it may be causing some confusion for Your Honor.  Is

17    the fire was started, the second fire, was started by

18    the use of some kind of an accelerant.  There is

19    video that shows the other individual that has been

02:19:00 20    charged, or at least I assume that is who it is.

21    Some individual approached the window of the cop car

22    and it looks like to me, I am interpreting it as a

23    gas can, and he pours what I assume is gasoline or

24    some type of an accelerant inside of the vehicle.

02:19:21 25    And that's -- so that's the type of fire that

1       Mr. Newbins is trying to put out.  And as you can

2       imagine, um, that fire probably got hot pretty quick.

3       It was approachable enough for him to get close to

4       try, but, um, he just couldn't -- he just couldn't

02:19:40   5    hold the wire.

6              THE COURT:  Thanks to you both.  I

7       appreciate your sharing your insight.  Mr. Yeates,

8       let me just go back to you.  Would you like to reply

9       to any of that?

02:19:50  10             MR. YEATES:  Yes, Your Honor.  And at the

11      risk of trying this before Your Honor during a

12      detention hearing, there are several points that need

13      to be discussed.

14             First of all, Your Honor has seen the

02:20:02  15    photographs of Mr. Newbins and other rioters standing

16      on top of the police car.  Photographs were taken of

17      them standing on top of the police car.  That

18      certainly isn't indicative of a protest rather than

19      riot.  That is a clear indicator of riot as opposed

02:20:23  20    to lawful First Amendment protests.  And so the Court

21      has to consider that fact that indeed he and others

22      with him were standing on top of the, as I recall,

23      overturned police car.

24             Also, Your Honor, as we look at the video

02:20:41  25    and the screen grabs, it's apparent that the paper

1    that he is using is not wet.  And if the Court is

2    interested in seeing some of those screen grabs, we

3    can show one.  But also, Your Honor, it is important

4    to note that there was water readily available that

02:20:57  5    can be seen in the video.  There is a large what

6    appears to be five-gallon jug that was right within

7    Mr. Newbins's reach and he didn't use it.  Rather, he

8    ran to a place where he could get something that

9    would burn.  And I would mention that Mr. Patton, who

02:21:14  10    is also charged by way of complaint, it appears that

11    he and Mr. Newbins have a brief conversation.  But

12    the two of them from the fire being started to

13    Mr. Newbins running and grabbing the poster board and

14    then running back, is all of about 15 seconds.  It

02:21:32  15    would be amazing if he were able to get a poster

16    board, roll it up, pour water on top of it, and then

17    take it to the vehicle.  There just simply wasn't

18    enough time based on the evidence.

19            But more so than that, Your Honor, as the

02:21:46  20    vehicle was burning, Mr. Newbins took a selfie of

21    himself kneeling in front of the car as it was

22    ablaze.  That, Your Honor, is not consistent with

23    someone who attempted to put out the fire.  That's

24    consistent with someone who is enjoying watching a

02:22:05  25    Salt Lake City patrol car burn.  And I can only

1    assume that defense counsel has that, Mr. Overson has

2    that available.  He has the Defendant's phone and if

3    he has it available, I would love for him to show

4    that selfie so that the Court can see it.  But we do

02:22:23  5    have video from at least one if not two angles that

6    clearly show Mr. Newbins taking that selfie with the

7    burning car in the background.

8           Now if the Court is interested in seeing

9    either the water bottle or the paper that looks to be

02:22:39  10   completely dry, Mr. Reeves is prepared to show that

11   to Your Honor.

12          THE COURT:  Mr. Overson, I would like to see

13   that.  Would you, too?

14          MR. OVERSON:  Let's see it.  And I just for

02:22:48  15   the record, as I mentioned before about this phone, I

16   have not gone through -- all I did was just peruse

17   some of the text messages.  I have not done anything.

18          THE COURT:  Okay.  Let's take a look at

19   this.  While that's happening, to Mr. Newbins,

02:23:02  20   Mr. Yeates is right it is not my job to determine

21   guilt or innocence.  But one of the challenges with

22   detention is the weight of the evidence, what weight

23   do I give the weight of the evidence.  That is why

24   we're spending all this time on this.

02:23:13  25          THE DEFENDANT:  I understand.

1           THE COURT:  I'm not -- I'm not tasked with

2      determining guilt.  But in my mind, much of the

3      arguments turn on the weight of the evidence here

4      today whether you should be detained.  So that's why

02:23:24  5      I want to see this.

6           (Video clip played.)

7           THE DEFENDANT:  The car wasn't on fire.

8           THE COURT:  I do see, as you have said,

9      Mr. Newbins, I can't tell if the fire is still on

02:25:55 10      when you take the picture but --

11           THE DEFENDANT:  No.  There was no fire at

12      that moment.

13           THE COURT:  I do see -- I do see you and

14      another individual posing for a selfie with the car.

02:26:03 15           THE DEFENDANT:  I know who that person is as

16      well.

17           MR. OVERSON:  No.

18           THE COURT:  Okay.  So Mr. Yeates, I think

19      that is what you were referring to.  Um, I couldn't

02:26:09 20      see anything from what he threw into the car.  It was

21      sort of hard for me to identify anything of substance

22      from that.  Is there anything else you can offer on

23      that?

24           MR. YEATES:  Yes, Your Honor.  I would ask

02:26:22 25      Mr. Reeves to show you a still frame from that video.

1      It is a close up and it pretty clearly shows the

2      rolled up poster board.

3              THE COURT:  Okay.

4              MR. YEATES:  Your Honor, while Mr. Reeves

02:26:47  5      works on pulling that up, I have mentioned that in

6      this video it shows the water that -- that he said he

7      previously drank from and was available to him to

8      pour on and he doesn't take advantage of that water

9      rather he takes advantage of throwing on paper.

02:27:06 10              THE COURT:  Okay.  There is the still.

11      Mr. Overson, do you see that?

12              MR. OVERSON:  I do.

13              THE COURT:  And Mr. Newbins, do you see

14      that?

02:27:14 15              THE DEFENDANT:  Yes.  It is blurry.

16              THE COURT:  Can you zoom out a little bit,

17      Mr. Reeves?

18              Okay.  So Mr. Overson and Mr. Newbins, I

19      believe that the Government's argument is that if

02:27:25 20      that were wet would it remain so, for a lack of

21      better term there, stiff?

22              THE DEFENDANT:  When I poured the water, I

23      poured it all throughout it on top.  So you don't --

24      you're seeing the end of it, um, not the very top.

02:27:39 25              THE COURT:  I see.

1          THE DEFENDANT:  And when I got all the way

2     right there where you see me standing, that is when I

3     realized the fire was too big and that was not going

4     to put it out.  And that is when I ran because I

02:27:49  5     already knew this situation was already out of hand

6     and that is when I ran back to my car.

7          THE COURT:  But after throwing it in the

8     fire all at the same, right?

9          THE DEFENDANT:  All at the same time, yes.

02:27:59 10          THE COURT:  Okay.  Thanks, Mr. Newbins.

11          Mr. Yeates, anything else?

12          MR. YEATES:  No, Your Honor.  We would

13     submit it.

14          THE COURT:  Mr. Overson, anything else you

02:28:08 15     want to add?

16          MR. OVERSON:  No, Your Honor.  We would

17     submit it.

18          THE COURT:  I rarely come across a

19     circumstance as challenging as this one, balancing

02:28:18 20     competing interests.  And one of the things I have

21     struggled with, I guess, is the information that has

22     been provided to here that contrary to at least what

23     Mr. Newbins's alleges, contrary to what was alleged

24     by the Government, it was an effort to put out

02:28:35 25     instead of add to.  That's challenging because it is

1       not my task to determine guilt or innocence.  It's

2       also challenging because there are competing

3       interests at play.  I think it's clear to me a couple

4       of things and I hope you will forgive me while I take

5       a moment to go through this.  I want to talk again

6       about that contrast between May 30th and June 1st.

7               There isn't a dispute here that I think

8       there is a contrast in Mr. Newbins's conduct.  There

9       is a dispute about what his conduct is on May 30th,

10      but there isn't a dispute about the contrast.  It's

11      the conduct on May 30th was sinister.  The complaint

12      references that he used a megaphone appearing to lead

13      demonstrators.  Paragraph 17 of the complaint says

14      that the Defendant negotiated a peaceful exit for the

15      group without mass arrests.  That's different, of

16      course, from what the Government alleges took place

17      on May 30th.  And I respect what Mr. Yeates has said

18      that it's not the Court's job to determine whether

19      someone should be charged on balance.  I am not

20      suggesting that.  But I do think that it goes to

21      whether Mr. Newbins can engage in conduct that isn't

22      violent.  The June 1st conduct was the antithesis of

23      what the Government alleges took place on Saturday

24      May 30th.  And I think that is worthy of some weight.

25      What stands out to me, what's undisputed, he is not

1    an instigator of the flame.  The Government alleges

2    he used existing materials.  And I assume existing

3    materials to contribute, it wasn't planned, for

4    instance, with flammable liquids.  It appears to me

02:38:42   5    that the inference to draw is he took whatever was

6    available to him, again if I consider the

7    Government's view, and added fuel to the fire.  He

8    didn't start it.

9         Now June 1st was nothing like May 30th.  I

02:38:54  10    think not for Salt Lake and frankly not for

11    Mr. Newbins.  I think it is fair to say as we've

12    talked about, he de-escalated and he was key in doing

13    that for many others.

14         This isn't just a passing judgment on

02:39:07  15    whether he should be charged.  I'm not suggesting

16    that at all.  It does suggest to me, however, a

17    willingness to work with and through lawful authority

18    without violence, or at least we have this contrast

19    that we need to grapple with in this regard.  On

02:39:23  20    balance, those -- that contrast, I think, is really

21    key to whether he should be detained.  I'm going to

22    go back to this in just a minute.

23         There are some other concerns that the Court

24    has.  We talked a little bit about employment.  He

02:39:41  25    hasn't worked since 2016.  He alleges disability from

1    car accidents.  But as far as I can tell, has only

2    recently pursued disability and instead according to

3    the report at least relies on others for support.

4         It does appear to me that he could work,

02:39:59  5    maybe not at jobs that he has historically had, but

6    even he suggested that he could work.  So I am

7    concerned about his absence of work but I also

8    appreciate the role that he wants to play as a

9    father.  Many individuals have to play those dual

02:40:14 10    roles and I wonder whether Mr. Newbins needs to do

11    that as well recognizing his circumstance may be

12    different from others.

13         I'm concerned about his mental and physical

14    health, the depression for anxiety and the diagnosis

02:40:27 15    for depression and anxiety in 2009 for which

16    medication was prescribed but he declines to take.

17    At least the report says he declines to take it.  He

18    doesn't suggest that there was an impediment to

19    taking it, which is a little bit in contrast to what

02:40:43 20    we have heard today that the absence of insurance

21    precludes it.

22         I am very concerned about his ongoing drug

23    use because that seems to be self-medicating to deal

24    with issues both physical and mental issues.  And

02:40:56 25    should I draw any inferences from that?  Maybe, I

1    don't know how much.  It appears to be marijuana.

2    And even if he qualifies for the medicinal marijuana

3    certificates or cards, I'm struck that he hasn't

4    taken advantage of the opportunity to do that in

02:41:15 5    earnest.  At least he finds himself in positions

6    where he uses without the card.  I don't think that

7    is worthy of too much weight to attach to that, but

8    it is worthy of something.

9          Residence.  I get a little bit more

02:41:27 10    concerned about this.  Only because, Mr. Overson, I'm

11    alarmed by that allegation from 2017, very alarmed by

12    it.  But you noted two critical things.  No

13    conviction resulted, it was a dismissal without

14    prejudice so the Government could bring it back.  His

02:41:44 15    common law wife is willing to have him return, but

16    they have been going through their own struggles.

17    And I'm not sure it is a great idea for him to return

18    there.  I struggle with his desire to be a dad to the

19    kids, but at the same time the allegations about what

02:41:59 20    he did to his common law wife are very concerning.

21    Strangling her twice, blocking the door so she can't

22    leave.  I don't give that the same weight I do to any

23    conviction, but it concerns me all the same.  I note,

24    for instance, that he has a sister that resides in

02:42:15 25    the district.  It may be better that he lives

1    somewhere else until we get him assessed at Valley

2    Mental and do some other things going forward to make

3    sure that he is not a danger.  Can we mitigate that

4    danger.

02:42:28  5         The failures to appear or meet obligations

6    as ordered by the Court are very concerning.  Many of

7    these failures are from the distant past.  Failure to

8    appear in 2011, later recalled; failure to appear on

9    a drug charge, 2011.  Reduced from a felony to

02:42:46 10   misdemeanor.  Failures to appear and comply with the

11   DUI offense, 2011.  Failure to appear on a driving

12   offense, suspended license from 2012 with a guilty

13   plea to a misdemeanor failure to appear as well.

14   Multiple failures to appear stemming from a false

02:43:03 15   information interference charge in 2012, accompanied

16   by a probation violation with credit for time served

17   in lieu of community service.  A failure to appear in

18   2018 relating to a DUI charge that is later dismissed

19   and therefore entitled to less weight.  A failure to

02:43:17 20   appear relating to a drug distribution charge

21   involving marijuana likewise later dismissed,

22   likewise entitled to lesser weight.  He has a pending

23   case for driving on a suspended license right now

24   with ignition interlock, drug paraphernalia in Orem

02:43:35 25   south of Salt Lake City from August of last year.  No

1    failures to appear in that case.

2         All of these things together, the lack of

3    work, the failures to appear, all of this gives him a

4    relatively pretrial risk assessment score, as

02:43:48   5    Mr. Yeates noted, of four.  This is a high score for

6    someone with his history.  It shouldn't be that high

7    and it could have been much lower if he took greater

8    consciousness and care in meeting his obligations.

9         I appreciate what Mr. Newbins has said about

02:44:05  10    being a man of his word, but the record also shows

11    that he has not always been responsive to Court

12    processes.  I think that the risk of flight is

13    manageable.  I recognize his ties elsewhere in the

14    community and I'm -- or elsewhere in the country, but

02:44:27  15    I think in light of his children being here, I don't

16    think that it is an unmanageable risk of flight.  I

17    think he could, with the right conditions,

18    monitoring, check-ins, and other things, I think that

19    is manageable.

02:44:41  20         The real issue in my mind is, is he a danger

21    to the community.  The Court emphasizes the lesser

22    role that I think he played on May 30th.  But if the

23    Government's theory is correct, it is dangerous all

24    the same.  There is other reasons for danger.  The

02:45:02  25    DUI offenses, which I know are misdemeanors, but that

1    likewise poses some risk to the community.  I am

2    concerned about the incident from 2012 when he fled

3    on foot, gave a false name to officers.  In my mind,

4    Mr. Overson, I think he is manageable but this turns

02:45:24  5    in the end on the weight of the evidence from May

6    30th.

7         I frankly am not sure what the truth

8    actually is regarding whether he intended to add to

9    or extinguish that flame.  I have only done my best

02:45:43 10    to try to draw inferences here today.  The

11    preliminary hearing will help it flesh out a little

12    bit better on whether there is probable cause that he

13    be held for further proceedings.  I have struggled

14    with what to do here.  Should I detain him pending

02:45:57 15    that weight of the evidence determination, or should

16    I release him because I am not sure what the weight

17    of the evidence is.

18         At the end of the day, I think he is

19    manageable, but I am not sure I am comfortable with

02:46:12 20    him returning to his home where the children are only

21    because of the 2017 incident.

22         Mr. Overson, do you believe there is another

23    place that he could stay?

24              MR. OVERSON:  Absolutely, Your Honor.

02:46:26 25              THE COURT:  Where else could he stay?

1          MR. OVERSON:  I believe that his sister

2    would accept him to live with her.  I don't think

3    that that would be a problem.

4          THE COURT:  Here is what I would like to

02:46:35  5    propose.  There are two things I need to consider.

6    Number one, is there an address that would be

7    appropriate where he could live at.  I don't mean to

8    suggest that he can't communicate with his common law

9    wife or with his children, but I'm very concerned

02:46:49 10    about what I read from 2017.  I don't believe they

11    should be living in the same house.

12          Number two, if during the meanwhile the

13    parties want to present additional evidence or

14    information regarding the claims of the defendant,

02:47:02 15    I'm happy to hear it or we can reserve judgment on

16    that and wait until we see the preliminary hearing.

17    It is going to take us some time to examine the

18    appropriate residence.  Would you propose his sister

19    above all others, Mr. Overson?

02:47:15 20          MR. OVERSON:  Um, let me ask Mr. Newbins.

21          THE COURT:  Mr. Newbins?

22          MR. OVERSON:  Is there -- would your sister

23    be the best place for you to reside while we're

24    waiting to get a resolution on this case?

02:47:27 25          THE DEFENDANT:  Yes.  My sister would not

1    contest that.  And if I can't stay with her, I have a

2    sister-in-law that's not too far down the street from

3    her, too.  It is my wife's sister.  I don't --

4         MR. OVERSON:  Are you able to provide the

02:47:40  5    Court with addresses right now?

6         THE DEFENDANT:  29 --

7         THE COURT:  You don't need to provide that

8    right here.  Mr. Overson, can you collect that

9    privately and then share that with Ms. Wollitz who is

02:47:50 10    on the call with us.  I'm going to ask Ms. Wollitz to

11    do a quick review, as quickly as she can do, and if

12    it is -- if it's an acceptable residence, I intend to

13    release him with conditions by the 11th.

14         Now, if it's not, we will reach out to you

02:48:10 15    and try to get another hearing if we can before the

16    17th to address that.  Mr. Newbins, this has been a

17    very close call in my opinion.  I'm going to list

18    some is conditions that I think you need -- I am

19    going to order that you must comply with.

02:48:25 20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  If you fail to comply with the

22    conditions, then you may run-- well, I won't just say

23    you may, you run a very serious risk of a warrant and

24    a return to custody.  Okay?

02:48:37 25         THE DEFENDANT:  I understand.

1          THE COURT:  So here is the conditions.

2    Assuming we can find an appropriate residence, you

3    must maintain or actively seek verifiable employment

4    and/or maintain or commence an educational program as

02:48:50   5    approved by the pretrial officer.  I recognize you

6    may be pursuing disability, that's fine, you're free

7    to do so.  But unless and until that is established,

8    I expect more.  I expect you looking for a job or to

9    get back in school.

02:49:04  10          You will maintain a residence and not change

11   that residence without prior permission from the

12   pretrial officer.  This is going to be the suitable

13   residence that we find so I don't have that right now

14   but hopefully we'll find one.

02:49:18  15          I want you to report on a regular basis to

16   the pretrial officers as directed.  You will not

17   possess a firearm, ammunition, destructive device or

18   other dangerous weapon.  You will not use or

19   unlawfully possess a narcotic drug or other

02:49:34  20   controlled substance as defined by federal law unless

21   prescribed by a licensed medical practitioner.

22   Prescriptions have to be reported to the pretrial

23   officer.

24          Now, I know that states have conditions on

02:49:45  25   marijuana use, but the federal law doesn't allow for

1 that.

2    THE DEFENDANT:  Okay.

3    THE COURT:  So you are going to have to make

4 some serious changes here.  You're going to have to

02:49:52 5 submit yourself to drug testing as directed by the

6 officer.  If testing reveals illegal drug use, I want

7 to be notified immediately.  If you miss a drug test,

8 I want to be notified immediately.  I want you to

9 participate in drug treatment as deemed advisable by

02:50:09 10 the pretrial officer.

11    I am going to order you to participate in

12 inpatient or outpatient substance abuse therapy and

13 counseling if deemed advisable by the pretrial

14 officer with you paying all or part of the cost of

02:50:23 15 the program based upon your ability to pay.  That

16 also relates to the drug testing.  You have to pay

17 all or part as based on your ability to pay.  You

18 will undergo a mental health evaluation and complete

19 any recommended treatment as directed by the pretrial

02:50:37 20 officer and take any mental health medications as

21 prescribed.  Again, you must pay all or part of the

22 cost of the program based upon your ability to pay.

23    I'm going to place you on something called

24 home detention for now, Mr. Newbins, and this is

02:50:53 25 because I frankly don't know what the evidence shows

1    as yet on June 1st.  I'm sorry, on May 30th.  You are

2    going to be restricted to that residence except for

3    employment, education, religious services, medical,

4    substance abuse, mental health treatment, attorney

02:51:08    5    visits, court appearances, court ordered obligations

6    and other activities pre-approved by the pretrial

7    officer.

8          The goal here is not to prevent your ability

9    to spend time with your kids.  To the contrary.  But

02:51:21    10    the goal is to avoid putting you in a position where

11    you could find yourself in trouble down the road.

12    Home detention could be modified down the road if

13    necessary, but for now that's what I'm going to

14    order.

02:51:31    15          THE DEFENDANT:  Okay.

16          THE COURT:  I'm going to order that you

17    submit your person, your residence, your office, or

18    vehicle to a search conducted by a pretrial officer

19    at a reasonable time and in a reasonable manner based

02:51:41    20    upon reasonable suspicion of contraband or evidence

21    of a violation of condition of release.  Failure to

22    submit to the search may be grounds for revocation.

23    And you need to warn the residents, wherever you

24    reside, that the home can be subject to search under

02:51:55    25    certain conditions.

1          THE DEFENDANT:  I understand.

2          THE COURT:  Mr. Newbins, this seems like a

3     lot and it is.

4          THE DEFENDANT:  It is.

02:51:59  5          THE COURT:  And it is because I'm very

6     concerned about what happened on May 30th.  This is

7     my best effort to try to balance the Government's

8     interests regarding your conduct versus your interest

9     in liberty.  If you violate these terms, you can

02:52:15 10     expect that negative factors -- or negative

11     circumstances will arise.  A warrant for your arrest,

12     being turned over to custody, okay?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Mr. Yeates, I know the

02:52:25 15     Government opposes release, but is there anything

16     that you would like me to add or consider on

17     conditions?

18          MR. YEATES:  No other additional conditions

19     that I can think of at this time, Your Honor.

02:52:37 20          THE COURT:  Thank you.

21          Mr. Overson, any other thoughts from you?

22          MR. OVERSON:  I just want some

23     clarification, Your Honor.  So if he is at his

24     sister's, are you asking that he be evaluated as part

02:52:54 25     of the mental health evaluation to determine whether

1    he is a danger to his spouse?  I'm just asking for

2    clarification, it's not an argument.

3        THE COURT:  It's not directly related to

4    that danger although I have concern about his mental

02:53:13  5    health condition as it poses a risk.  So the mental

6    health eval will help us understand whether he poses

7    a danger and what medications can be taken, if any,

8    to mitigate that or whether it is counseling or other

9    things.  Does that make sense?

02:53:27 10        MR. OVERSON:  Right.  I just wanted to get a

11    sense of whether I needed to focus the evaluation on

12    that as well and submit that to the Court.

13        THE COURT:  Well, and we're going to

14    organize that too, Mr. Overson, so our pretrial

02:53:40 15    officers will help arrange this, okay?

16        MR. OVERSON:  Okay.  Well, yes.  Yeah I

17    guess that is true.  I apologize.

18        THE COURT:  So it's not -- it's not at your

19    direction, it's at ours.

02:53:50 20        MR. OVERSON:  Right.  Right.  Um, okay, that

21    clarifies it for me.  Thank you.

22        THE COURT:  Okay any other clarifications or

23    suggestions?

24        MR. OVERSON:  No, Your Honor.

02:53:58 25        THE COURT:  Thanks.  Mr. Newbins, are you

```
 1    willing to keep all of these conditions?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  We will eventually get you this

 4    form, but I'm going to sign, you're going to sign it

 5    as well indicating that you're willing to keep them

 6    all and appear for all hearings.  Okay?

 7              THE DEFENDANT:  Thank you.

 8              THE COURT:  This has been a very close call

 9    in my decision.  It could be that the Government may

10    want to appeal it, I don't know.  But for now, unless

11    and until that happens, you need to do very -- you

12    need to do your very best to keep all of them and do

13    them well.  You're going to be in custody until the

14    11th.  I need a place for you to go that I think is

15    appropriate first.  If there is a problem there,

16    we'll try to get an emergency hearing even if we have

17    to do it by phone and discuss the next step.  Okay?

18              THE DEFENDANT:  Okay.  Thank you.

19              THE COURT:  Mr. Overson, anything else from

20    the Defendant?

21              MR. OVERSON:  No, Your Honor.

22              THE COURT:  Mr. Yeates?

23              THE DEFENDANT:  Is it all right if I give

24    you the address?

25              MR. YEATES:  No, Your Honor.
```

Time stamps (left margin): 02:54:07 (line 5), 02:54:15 (line 10), 02:54:31 (line 15), 02:54:40 (line 20), 02:54:45 (line 25)

1            THE COURT:  Here's what I'm going to do.

2    Teri, would you send Ms. Wollitz, Mr. Newbins, and

3    Mr. Overson to a separate brake-out room so that they

4    can collect those addresses and phone numbers?

02:54:59  5    Meanwhile, thanks everyone.  For the rest of you, the

6    hearing is concluded.

7            MR. OVERSON:  Thank you, Your Honor.

8            THE DEFENDANT:  Thank you, Your Honor.

9            MR. REEVES:  Thank you, Your Honor.

02:55:08 10            THE COURT:  My pleasure.  Thank you.

11            THE CLERK:  Teri we have people in the

12    waiting room for the 2:30 probably, right?

13            (Whereupon, the hearing concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1              **REPORTER'S CERTIFICATION**

2

3          I hereby certify that the foregoing

4    transcript was taken from a Zoom video recording

5    stenographically to the best of my ability to hear

6    and understand said video recording, that my said

7    stenographic notes were thereafter transcribed into

8    typewriting at my direction.

9

10

11

12              _____

13                   Laura W. Robinson

14

15

16

17

18

19

20

21

22

23

24

25